# IN THE SUPREME COURT OF TEXAS

═══════════════

No. 16-0626

═══════════════

WILLACY COUNTY APPRAISAL DISTRICT, PETITIONER,

v.

SEBASTIAN COTTON & GRAIN, LTD., RESPONDENT

═══════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

═══════════════════════════════════════════════

**Argued January 10, 2018**

JUSTICE GREEN delivered the opinion of the Court.

This case arises out of a property-tax dispute regarding ownership of tangible personal property. Based on Sebastian Cotton & Grain Ltd.'s representation that it owned grain inventory stored on its property, Willacy County Appraisal District (WCAD) listed Sebastian as the owner of the grain on the 2009 appraisal roll. After receiving the tax bill, Sebastian requested a correction to the appraisal roll and produced to WCAD documents showing it had sold the grain to DeBruce Grain. Agreeing to Sebastian's request, WCAD corrected the appraisal roll to reflect DeBruce as the property owner. DeBruce then protested, asserting it was not the owner because the grain was not in its possession on the assessment date. WCAD ultimately changed the 2009 appraisal roll back

to again reflecting Sebastian as the grain's owner. Sebastian protested, asserting that WCAD lacked authority to make that change to the appraisal roll.

We must decide three legal issues: (1) whether Property Tax Code section 25.25(b) authorizes an appraisal district to correct ownership on an appraisal roll when such a correction necessarily alters the taxing units' expectation of who is liable for payment of property taxes; (2) whether an agreement under Property Tax Code section 1.111(e) may be voided if it was induced by fraud; and (3) whether a purported owner challenging ownership on the appraisal roll is entitled to recover attorney's fees under Property Tax Code section 42.29. We hold that when, as here, an ownership correction to the appraisal roll does not increase the amount of property taxes owed for subject property in the year of the correction, an appraisal district's chief appraiser has statutory authority under section 25.25(b) to make such a correction. We further hold that a section 1.111(e) agreement may be rendered voidable if fraud is proven. Finally, we hold that Sebastian is not entitled to attorney's fees under section 42.29. We reverse the judgment of the court of appeals and remand the case to that court for further proceedings consistent with this opinion.

## I. Background

In May 2009, Jerry Jurica, Sebastian's property-tax agent, filed a Rendition of Taxable Personal Property with WCAD on behalf of Sebastian. *See* TEX. TAX CODE § 22.01(a) (requiring a property owner to declare, or "render," to the appraisal district "all tangible personal property used for the production of income that the person owns . . . on January 1" so that the property may be taxed). In its rendition, Sebastian represented to WCAD that it owned all of the grain in its possession as of January 1, 2009. At the same time, Sebastian filed an application for exemption of

2

the grain inventory under section 11.251 of the Property Tax Code, the "Freeport" exemption.[1] In fact, the property was not eligible for the Freeport exemption, so WCAD denied Sebastian's exemption application. Based on the grain inventory values contained in Sebastian's rendition, WCAD appraised Sebastian's inventory at $2,315,894, and the 2009 appraisal roll reflected that value. *See id.* §§ 22.01(a) (requiring an owner to identify, describe, give the location of, and estimate the value of the tangible personal property it owns), 25.01(a) (requiring the chief appraiser to prepare the district's appraisal records based on rendition information and "listing all property that is taxable in the district and stating the appraised value of each"), 25.22(a) (stating that appraisal records are submitted to the appraisal review board (ARB) for review and determination of protests), 25.24 (stating that once corrected, if necessary, and approved by the appraisal review board, the appraisal records constitute the appraisal roll for the district). Property taxes were assessed and levied accordingly. *See id.* § 26.01 (requiring appraisal rolls to be submitted to the local taxing units so that taxes may be assessed accordingly).

Upon receiving the tax bill, Sebastian called on Jurica to assist in getting ownership changed on the appraisal roll. Jurica emailed WCAD and asserted that only 14% of the grain rendered was actually owned by Sebastian. In his email, Jurica told WCAD that Sebastian "mistakenly thought the Freeport exemption exempted all the taxes which is why they did not distinguish ownership on the rendition." Sebastian's controller, who was responsible for coordinating the rendition of Sebastian's grain inventory, stated in affidavit evidence admitted at trial that it was her practice to

---

[1] The "Freeport" exemption provides that property transported out of Texas within 175 days of being brought into or acquired in the state is not taxable. TEX. CONST. art. VIII, § 1-j(3)(A); TEX. TAX CODE § 11.251(a).

render all grain in Sebastian's possession, even if Sebastian did not believe it was the actual owner of the grain. On Sebastian's behalf, Jurica filed a motion to correct ownership pursuant to section 25.25(c) of the Property Tax Code, asserting that 86% of the grain Sebastian had rendered was actually sold to DeBruce in 2008.[2] *See id.* § 25.25(c)(4) (allowing an ARB, on motion of the chief appraiser or a property owner, to direct changes in the appraisal roll to correct an error in which property is shown as owned by a person who did not own the property on January 1 of that tax year). In support of the motion, Jurica produced four purchase contracts indicating that Sebastian had sold the grain at issue, a total of 1,340,000 bushels, to DeBruce prior to January 1, 2009. Each contract was titled "Purchase Contract Confirmation," and each was dated 2008.[3] All four contracts provided the shipment period to be during the year 2008.

After filing the section 25.25(c) motion, Jurica called WCAD's chief appraiser to ask if he had received the motion and to inquire as to his position or response. The chief appraiser told Jurica that he had received the motion and that he would make the requested change. Jurica stated in his affidavit, "At that point, it was clear we had reached an agreement on the Section 25.25 Motion to Correct Ownership that I had filed." Because the dispute had been resolved, a hearing before the Willacy County Appraisal Review Board (WCARB) was never scheduled or conducted on the motion. *See id.* § 25.25(e) (providing that a party bringing a section 25.25(c) motion is entitled to request a hearing and a determination by the ARB if the chief appraiser and property owner do not

---

[2] Thus, the value of the grain in dispute was $1,991,669.

[3] The first contract was dated July 18, 2008, the next two were dated August 13, 2008, and the last one was dated October 3, 2008.

4

agree to the correction before the 15th day after the motion is filed). Based on this phone call, Sebastian asserts that, with Jurica acting as its agent, it entered into a binding agreement with the chief appraiser under section 1.111(e) of the Property Tax Code. *See id.* § 1.111(e). Under that section, "[a]n agreement between a property owner or the owner's agent and the chief appraiser is final if the agreement relates to a matter . . . which may be corrected under Section 25.25 or on which a motion for correction under that section has been filed but not determined by the board." *Id.* The chief appraiser changed the appraisal roll to reflect DeBruce as the grain owner, and Sebastian received a tax refund as a result of this correction.

DeBruce then protested the corrected appraisal roll and resulting tax assessment, also asserting non-ownership of much of the disputed grain. It argued that legal title and ownership of the grain were tied to shipment; thus, it owned only the portion of the grain that had been shipped as of January 1, 2009.[4] In support, DeBruce relied on the purchase contracts produced by Sebastian, which indicate the parties' agreement to follow the National Grain and Feed Association Rules (NGFA Rules) in the event of a dispute. Rule 6 of the NGFA Rules provides, in relevant part:

> Title, as well as risk of loss and/or damage, passes to the Buyer as follows: (A) On f.o.b. origin or f.o.b. basing point contracts, at the time and place of shipment. The time of shipment is the moment that the carrier accepts the appropriate shipping document. . . . (B) On delivered contracts: . . . By truck, upon arrival at the Buyer's final destination.

NAT'L GRAIN & FEED ASS'N, NGFA GRAIN TRADE RULES, Rule 6 (2017). Three of the four contracts are designated f.o.b. contracts, so under Rule 6, title would pass upon shipping. The fourth is a delivered contract—designated DEL—so under the same rule, title would pass upon arrival at

---

[4] DeBruce conceded that it did have legal title to and ownership of 138,300 bushels valued at $601,605 on January 1, 2009—30.2061% of the grain in dispute.

5

the final destination. DeBruce produced evidence that, notwithstanding the shipping dates listed on the contracts (which indicated that the grain was to be shipped in 2008), the grain was actually shipped to DeBruce for resale on various dates in January 2009, the first being January 5. Additionally, grain under two of the contracts—totaling 808,797 bushels—was never delivered and those orders were canceled. WCAD concluded that DeBruce did not own the grain on January 1, 2009, and the chief appraiser corrected the appraisal roll pursuant to Property Tax Code section 25.25(b) to again reflect Sebastian as the owner of the grain. *See* TEX. TAX CODE § 25.25(b) (allowing the chief appraiser to change the appraisal roll to correct a determination of ownership under certain circumstances).

Sebastian protested the chief appraiser's correction, arguing that WCAD exceeded its authority under section 25.25(b). The statute provides:

> The chief appraiser may change the appraisal roll at any time to correct a name or address, a *determination of ownership*, a description of property, multiple appraisals of a property, an erroneous denial or cancellation of any exemption authorized by Section 11.13 if the applicant or recipient is disabled or is 65 or older or an exemption authorized by Section 11.13(q), 11.131, or 11.22, or a clerical error or other inaccuracy as prescribed by board rule *that does not increase the amount of tax liability*.

*Id.* (emphasis added). Sebastian argued before the WCARB that the statute does not allow WCAD to change a determination of ownership if doing so would increase the tax liability of an individual property owner—here, Sebastian. The record in this case does not contain a record of the WCARB hearing; however WCAD alleges that at the hearing, DeBruce presented evidence that it did not own the grain on January 1, 2009, but Sebastian did not provide any evidence of non-ownership. The WCARB determined that DeBruce's representation of non-ownership was correct and upheld the chief appraiser's authority to correct ownership under section 25.25(b). It issued orders allocating

6

the value of the disputed grain between Sebastian and DeBruce based on their respective ownership on January 1, as determined by the shipping dates. Thus, under the WCARB's order, Sebastian owned 69.794% of the disputed grain, valued at $1,390,064, and DeBruce owned 30.206%, valued at $601,605.

Sebastian appealed to the district court, reasserting its argument that WCAD lacked authority under section 25.25(b) to change the ownership on the appraisal roll because such a change increased Sebastian's tax liability. *See id.* § 42.01 (outlining a property owner's right to appeal an order of the ARB to district court). Sebastian also argued that when WCAD agreed over the phone with Jurica to change the appraisal roll to reflect DeBruce as the owner of the grain, WCAD entered into a binding agreement under section 1.111(e) that was final and precluded both any subsequent determinations as to ownership by the chief appraiser or WCARB and judicial review of the matter. WCAD did not deny that there was such an agreement, but it asserted as an affirmative defense that the agreement resulted from Sebastian's fraudulent misrepresentations that it did not own the property, and that Sebastian should not benefit from that agreement. Specifically, WCAD asserted that Sebastian's section 25.25(c) motion to correct ownership of the grain was false, misleading, and/or fraudulent because Sebastian knew or should have known with the exercise of due diligence that it owned the grain as of January 1, 2009.

While Sebastian's appeal of the WCARB decision was pending in the district court, WCAD sought discovery from Sebastian related to the question of ownership of the grain at issue here. The discovery issue was ultimately presented to the court of appeals, which granted mandamus relief. *In re Willacy Cty. Appraisal Dist.*, No. 13-13-00550-CV, 2013 WL 5942707, at *5 (Tex. App.—Corpus Christi–Edinburg Nov. 1, 2013) (orig. proceeding) (mem. op.). The court declined

to address the questions before us today, but it did decide that a fraud defense to a section 1.111(e) agreement is potentially viable. *Id.* at \*3–4. Sebastian petitioned for mandamus relief, which we denied. 57 Tex. Sup. Ct. J. 310 (Mar. 24, 2014).

The district court, in a trial de novo, upheld the WCARB's determination of ownership and made findings of fact, including:

> 4. On December 15, 2009, after it received its tax statement for 2009, Sebastian represented to WCAD that it did not own most of the grain inventory it had previously rendered because the grain had been sold to Debruce Grain prior to January 1, 2009. . . .
>
> . . . .
>
> 12. The Rules of the National Grain & Feed Association, which governed the Purchase Confirmations, provide that title to and risk of loss [of] the grain identified in the four Purchase Confirmations did not transfer to DeBruce until the grain was delivered.
>
> 13. Of the grain described in the Purchase Confirmations, only 138,300 bushels, with a value of $601,605, had been delivered to DeBruce in 2008.
>
> 14. Sebastian's representations to WCAD as to the ownership of the grain as of January 1, 2009 were false.
>
> 15. Sebastian's representations as to the ownership of the grain as of January 1, 2009 were made knowingly and/or with reckless disregard for the truth and as a positive assertion.
>
> 16. Sebastian's representations were made with the intent that WCAD act on them.
>
> 17. WCAD acted on Sebastian's representations.
>
> 18. WCAD suffered injury as a result.

The district court concluded that Sebastian obtained the section 1.111(e) agreement through fraudulent misrepresentations as to the ownership of the grain, and the agreement was void as a result of Sebastian's fraud.

8

The court of appeals reversed and rendered in part, holding that WCAD lacked authority to change the ownership determination under Property Tax Code section 25.25(b), without reaching the issue of whether a section 1.111(e) agreement may be voided if it was induced by fraud. 492 S.W.3d 824, 835–36 (Tex. App.—Corpus Christi–Edinburg 2016, pet. granted). The court of appeals remanded the case to the trial court to determine reasonable and necessary attorney's fees consistent with Property Tax Code section 42.29. *Id.* at 836–37; *see* TEX. TAX. CODE § 42.29 ("A property owner who prevails in an appeal to the court . . . of a determination of an appraisal review board on a motion filed under Section 25.25 . . . may be awarded reasonable attorney's fees."). We granted WCAD's petition for review. 60 Tex. Sup. Ct. J. 1607 (Sept. 1, 2017).

## II. Analysis

We are presented with three statutory construction issues: (1) whether WCAD had authority under section 25.25(b) to correct the appraisal roll to reflect Sebastian as the owner of the grain; (2) if Sebastian and WCAD had a section 1.111(e) agreement, whether that agreement may be voided if it was induced by fraud; and (3) whether Sebastian is entitled to recover attorney's fees under section 42.29. We review issues of statutory construction de novo. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010).

In construing statutes, our primary objective is to give effect to the Legislature's intent. *Id.* We rely on the plain meaning of the text as expressing legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context, or the plain meaning leads to absurd results. *Id.* When a statute is not ambiguous on its face, it is inappropriate to use extrinsic aids to construe the unambiguous statutory language. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex. 2008). A statute is ambiguous if its words are susceptible to two or more reasonable

9

interpretations and we cannot discern legislative intent from the language alone. *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 41 (Tex. 2017). We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired. TEX. GOV'T CODE § 311.011(b); *City of Rockwall*, 246 S.W.3d at 625. Otherwise, we construe the statute's words according to their plain and common meaning. *See* TEX. GOV'T CODE § 311.011(a); *City of Rockwall*, 246 S.W.3d at 625–26.

### A. Section 25.25(b)

Section 25.25 of the Property Tax Code provides mechanisms by which a chief appraiser or a property owner may effect corrections to an appraisal roll. TEX. TAX CODE § 25.25. In relevant part, the statute reads:

> The chief appraiser may change the appraisal roll at any time to correct a name or address, *a determination of ownership*, a description of property, multiple appraisals of a property, an erroneous denial or cancellation of any exemption authorized by Section 11.13 if the applicant or recipient is disabled or is 65 or older or an exemption authorized by Section 11.13(q), 11.131, or 11.22, or a clerical error or other inaccuracy as prescribed by board rule *that does not increase the amount of tax liability*. Before the 10th day after the end of each calendar quarter, the chief appraiser shall submit to the appraisal review board and to the board of directors of the appraisal district a written report of each change made under this subsection that decreases the tax liability of the owner of the property.

*Id.* § 25.25(b) (emphasis added). The parties argue about both the application and the meaning of the restrictive clause—"that does not increase the amount of tax liability." Sebastian argues that the restriction attaches to each correction permitted under the statute, and that the plain language of the provision prohibits the chief appraiser from making any of the listed corrections if doing so would increase *an individual's* tax liability. The court of appeals agreed with this interpretation. 492 S.W.3d at 834–35. WCAD argues that the restrictive language attaches only to the phrase immediately preceding it, meaning that only a correction of a "clerical error or other inaccuracy as

10

prescribed by board rule" is subject to the restriction.  Moreover, WCAD asserts that the disputed language properly refers to *net* tax liability—that is, the taxes assessed against a specific piece of property.  We address these arguments in turn.

### 1. Application of the Restrictive Clause

The parties rely on different canons of statutory construction recognized by this Court to advance their respective positions as to the restrictive clause's application.  Sebastian relies on the series-qualifier canon, which provides that "when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." *Sullivan v. Abraham*, 488 S.W.3d 294, 297 (Tex. 2016).  WCAD relies on the last-antecedent canon, which provides that "a qualifying phrase in a statute or the Constitution must be confined to the words and phrases immediately preceding it to which it may, without impairing the meaning of the sentence, be applied." *Id.*

The two canons are mutually exclusive and where either might reasonably apply, neither is by itself instructive in our understanding of this statute. *Id.*  When necessary, we have in the past analyzed punctuation as "a permissible indicator of meaning." *See id.* (citing ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147 (2012)).  However, we see no reason here to undertake an exhaustive discourse on the legislative intent behind use of the oxford comma.  We assume for the purpose of argument that the restrictive phrase attaches to each item in the series, including a determination of ownership, and we analyze the meaning of the phrase under that assumption.

11

## 2. Meaning

The parties dispute whether the restrictive language in section 25.25(b) refers to "[net] tax liability" (the taxes assessed against subject property) or "[individual] tax liability" (the taxes billed to a specific person). We presume that the Legislature "chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). With that in mind, we first note that when the Legislature intends to address the tax liability of an individual property owner, it does so expressly. Multiple sections in the Property Tax Code refer to corrections that affect the "tax liability of a property owner." *See, e.g.*, TEX. TAX CODE §§ 26.15 (permitting corrections to the tax roll), 41.09 (allowing an ARB to correct clerical errors in appraisal records when it "will not affect the tax liability of a property owner"), 41.10 (allowing an ARB, on recommendation of a chief appraiser, to correct appraisal records when it "will not result in an increase in the tax liability of a property owner"), 41.11(a) (requiring the ARB to deliver written notice of changes in appraisal records to property owner when changes "will result in an increase in the tax liability of the property owner"). Even the second sentence of section 25.25(b) itself refers to the liability "of the owner of the property." *Id.* § 25.25(b). In fact, the restrictive language of section 25.25(b) is the *only* place in the Property Tax Code where the Legislature does not refer explicitly to the tax liability of a property owner, but refers instead to "the amount of tax liability." Therefore, where the Legislature does not specifically refer to the "tax liability of a property owner," we decline to infer that meaning and we look to the statutory context for guidance.

We recognize a fundamental principle of statutory construction that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used. *Greater*

*Houston P'ship v. Paxton*, 468 S.W.3d 51, 59 (Tex. 2015); *see also 20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008) ("We determine legislative intent from the entire act and not just isolated portions."). Accordingly, in assessing the meaning of section 25.25(b), we consider how that provision fits both within the narrow framework of the tax-appraisal protest scheme and within the broader scope of the Property Tax Code as a whole. *See Fredericksburg Care Co. v. Perez*, 461 S.W.3d 513, 520 (Tex. 2015) (holding that in construing a statutory provision, "we should consider the act as a whole, and not just single phrases, clauses, or sentences").

### a. Tax Appraisal Protest Scheme

The appraisal records, as changed by order of the ARB and approved by that board, constitute the appraisal roll for the district. TEX. TAX CODE § 25.24. "The [L]egislature's intent, as may be determined from the overall tax appraisal protest scheme, is that the appraisal rolls become fixed after property owners have been given adequate time to file their protests." *Anderton v. Rockwall Cent. Appraisal Dist.*, 26 S.W.3d 539, 543 (Tex. App.—Dallas 2000, pet. denied). Thus, the Legislature has provided only two direct avenues by which an appraisal roll may be changed. Chapter 41 allows a property owner to file a protest for substantive challenges to property appraisals. *See* TEX. TAX CODE § 41.44; *Anderton*, 26 S.W.3d at 543. Section 25.25, on the other hand, allows for the correction of errors that do not involve the substantive re-evaluation of a property's market value.[5] *See* TEX. TAX CODE § 25.25; *Anderton*, 26 S.W.3d at 543. A property owner may also appeal an ARB order resulting from either of those processes. TEX. TAX CODE §§ 25.25(a), 42.01.

---

[5] Section 25.25(d) does allow for some substantive re-evaluation of a property's value, but its application is expressly limited by the statute. TEX. TAX CODE § 25.25(d).

Chapter 41 gives property owners the right to protest a number of actions before the ARB, including the appraised value of their property, a determination of ownership, or "any other action of the chief appraiser, appraisal district, or appraisal review board that applies to and adversely affects the property owner." *Id.* § 41.41(a). Chapter 41 protests are broad in scope and weigh in favor of the property owner, placing the burden of establishing the value of the property on the appraisal district. *Id.* §§ 41.41, .43(a). However, such protests are subject to strict time limitations. *Id.* § 41.44. In most cases, a property owner must file a notice of protest within thirty days of receiving notice of the appraised value—that is, before the final deadline for the appraisal records to be approved by the ARB. *Compare id.* § 41.44(a)(2) (allowing for protests before June 1 or not later than the 30th day after the property owner received notice under section 25.19, whichever is later) *with id.* § 41.12(a) (providing that July 20 is the final deadline for the ARB to determine timely filed challenges and approve appraisal records). Upon a showing of good cause, this deadline may be extended to the date the ARB approves the appraisal record. *Id.* § 41.44(b).

Section 25.25, on the other hand, allows corrections after the time to protest has expired and appraisal rolls have been approved. *Id.* § 25.25; *see also Anderton*, 26 S.W.3d at 543. Such corrections can be made only under limited circumstances, but they are afforded a more generous limitations period. *See* TEX. TAX CODE § 25.25; *Bauer-Pileco, Inc. v. Harris Cty. Appraisal Dist.*, 443 S.W.3d 304, 310 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Section 25.25(b) allows the chief appraiser to change the appraisal roll at any time to correct basic factual errors, such as a name or address, a determination of ownership, a description of property, or a clerical error. TEX. TAX CODE § 25.25(b). Section 25.25(c) allows the ARB to make similar changes on a motion of the property owner or the chief appraiser. *Id.* § 25.25(c). Under section 25.25(c), the ARB may order

14

changes to the appraisal roll for the five preceding years. *Id.* Section 25.25(d) is the only provision allowing for a substantive re-evaluation of a property's value on the appraisal roll. *See id.* § 25.25. But a motion for such a correction must be made before the taxes become delinquent, and a correction may not be made unless an error resulted in an appraised value that exceeds the correct appraised value by more than one-third. *Id.* § 25.25(d). If the appraisal roll is changed under section 25.25(d), the property owner must pay a late-correction penalty. *Id.*

Thus, the tax appraisal protest scheme evidences the Legislature's intent to restrict substantive challenges to the appraisal rolls—making them "fixed" after the period for chapter 41 protests has elapsed, with the exception of allowing limited error-correction. *See Anderton*, 26 S.W.3d at 543. The limited corrections available under section 25.25(b) and (c) "include only objective and ministerial matters such as clerical errors." *Id.* Such corrections "do not include the substantive reevaluation of a property's market value." *Id.*; *see also MAG-T, L.P. v. Travis Cent. Appraisal Dist.*, 161 S.W.3d 617, 627 (Tex. App.—Austin 2005, pet. denied) (acknowledging that taxing authorities are not permitted under section 25.25 to increase the *value* at which property had been appraised after the appraisal roll has been certified). In this way, the corrections permitted under section 25.25 stand in contrast to the substantive protests allowed by section 41.41.[6] We agree with courts of appeals' holdings that the purpose of section 25.25 is to permit the correction of "objective, factual errors that would cause the payment of taxes based on the uncorrected records to be fundamentally unfair." *Kellair Aviation Co. v. Travis Cent. Appraisal Dist.*, 99 S.W.3d 704, 707

---

[6] As explained above, section 25.25(d) does allow for limited substantive corrections. TEX. TAX CODE § 25.25(d). However, the limitation on this substantive review (that a substantive error may not be corrected unless it resulted in an appraised value that exceeds the correct value by more than one-third) and the ten-percent penalty imposed on late corrections under this subsection demonstrate the Legislature's intent to limit substantive changes to the appraisal roll. *See id.*

(Tex. App.—Austin 2003, pet. denied); *see also Tomball Indep. Sch. Dist. v. Mustang Mach. Co. Ltd.*, 497 S.W.3d 131, 134 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (analyzing section 25.25(c)); *Bauer–Pileco, Inc.*, 443 S.W.3d at 310–11 (same); *Anderton*, 26 S.W.3d at 542–43 (same); *GE Capital Corp. v. Dallas Cent. Appraisal Dist.*, 971 S.W.2d 591, 593 (Tex. App.—Dallas 1998, no pet.) (same).

It should go without saying that an error that results in a non-owner of property having to pay the taxes on that property would be fundamentally unfair. The correction of such an error does not involve a substantive challenge to the appraised value of the property and does not require a re-evaluation of the property's market value. *Cf. Anderton*, 26 S.W.3d at 543 (holding that section 25.25 corrections are limited to "objective and ministerial matters" that "do not include the substantive reevaluation of the property's market value"). Thus, WCAD's correction of ownership on the appraisal roll falls squarely within the purview of section 25.25(b).[7]

### b. Property Tax Code Overview

We turn then to the broader scheme of the Property Tax Code to ensure that this interpretation is consistent with the structure of the Code and to address due process concerns. Sebastian argues that allowing an appraisal district to shift tax liability by making corrections under

---

[7] In a related case, the Thirteenth Court of Appeals held that section 25.25 must be construed with chapters 41 and 42 of the Property Tax Code to prohibit a chief appraiser from using section 25.25(b) corrections to override final ARB determinations. *Cameron Cty. Appraisal Dist. v. Sebastian Cotton & Grain, Ltd.*, 443 S.W.3d 212, 217 (Tex. App.—Corpus Christi–Edinburg 2013, no pet.). The underlying facts are the same as in this case: a dispute arose about whether Sebastian or DeBruce owned taxable grain and Sebastian, who was listed on the appraisal roll as owning the grain at issue, filed a motion to correct ownership pursuant to section 25.25(c). *Id.* at 213. After a hearing, the ARB ordered that the appraisal roll be corrected to reflect DeBruce as owning 86% of the grain. *Id.* The ARB's order was not appealed. *Id.* Believing that Sebastian provided "false testimony" during the ARB hearing, the chief appraiser again corrected the appraisal roll under section 25.25(b) to reflect Sebastian as the owner. *Id.* at 213–14, 217. Sebastian protested the change, and the ARB ordered the appraisal roll corrected to reflect that Sebastian owned 79% of the grain. *Id.* at 214. While the case before us does not present a situation in which section 25.25(b) was used to override a final ARB decision and is therefore distinguishable, we agree with that court that "section 25.25(b) does not give the Appraisal District a 'complete' and 'unilateral' authority to correct issues of ownership." *Id.* at 217.

section 25.25(b) violates due process because section 25.25(b) does not require a hearing. While the statute does not contemplate a hearing for corrections under section 25.25(b) as it does for corrections under section 25.25(c) and (d), we note at the outset that the Property Tax Code's protest scheme may allow for a hearing to challenge such a correction. *See* TEX. TAX CODE § 41.41(a)(9) (providing that a taxpayer has a right to protest to the ARB an "action of the chief appraiser . . . that applies to and adversely affects the property owner"). In this case, WCAD's chief appraiser's letter notifying Sebastian of the correction under section 25.25(b) advised Sebastian that it had thirty days to protest the action to the WCARB. Sebastian filed a protest and was afforded a hearing before the WCARB. Therefore, we reject the suggestion that Sebastian was denied due process in this case. *See Sondock v. Harris Cty. Appraisal Dist.*, 231 S.W.3d 65, 70 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("[D]ue process simply affords a right to be heard before final assessment; it does not detail the review mechanism.") (quoting *ABT Galveston Ltd. v. Galveston Cent. Appraisal Dist.*, 137 S.W.3d 146, 155 (Tex. App.—Houston [1st Dist.] 2004, no pet.)).

The court of appeals noted that when a taxpayer's individual liability may be increased, the taxpayer has "detailed due process" rights to notice, a protest, and a hearing. 492 S.W.3d at 834. We agree that when a taxpayer's liability is in fact increased, the taxpayer's due process rights are implicated. *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, Dep't of Bus. Regulation of Fla.*, 496 U.S. 18, 36 (1990) ("Because exaction of a tax constitutes a deprivation of property, the State must provide procedural safeguards against unlawful exactions in order to satisfy the commands of the Due Process Clause."). Therefore, we consider section 25.25's role within the Property Tax Code to determine how a correction as to a determination of ownership affects tax liability.

17

In analyzing the Property Tax Code as a whole, we begin by observing that property taxes, by definition, are tied to land or personal property, unlike other types of taxes, which may be tied to a person or entity. *Compare* TEX. CONST. art. VIII, § 1(b) ("All real property and tangible personal property in this State . . . shall be taxed in proportion to its value.") *with id.* art. VIII, § 24(b) (limiting the Legislature's authority to impose a tax on the net incomes of natural persons). Property tax liability, therefore, derives from ownership of property. *See* TEX. TAX CODE § 32.07. A person who owns property is generally liable for property taxes assessed on that property, and a person who does not own property generally has no property tax liability. *See Green Tree Servicing, LLC v. Travis Cty.*, No. 03-10-00709-CV, 2011 WL 3890408 at *7 (Tex. App.—Austin 2011, no pet.) (mem. op.) (holding that a party "presenting prima facie proof that it did not own the [property] at issue . . . set up a meritorious defense to its liability for the taxes assessed"). Thus, as explained below, we discern an important principle evident in the Property Tax Code that informs our analysis—a property owner's tax liability exists by virtue of ownership, independent of the appraisal roll or tax bill.

A property tax, or "ad valorem" tax, is a tax on property at a certain rate based on the property's value. *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 387 (Tex. 2002). The Texas Constitution provides that "[a]ll real property and tangible personal property in this State" is subject to such a tax "unless exempt as required or permitted by [the] Constitution." TEX. CONST. art. VIII, § 1(b). The Property Tax Code is thus founded on the notion that "[a]ll real and tangible personal property that this state has jurisdiction to tax is taxable unless exempt by law." TEX. TAX CODE § 11.01(a). This Court has long recognized that property taxes are tied to the property rather than to an individual. *See, e.g.*, *State v. Wynne*, 133

18

S.W.2d 951, 956 (Tex. 1939) (comparing property taxes and excise taxes, stating: "If the tax is directly on property itself, the tax is a property tax."). In fact, the Property Tax Code provides that on January 1, the day that property ownership gives rise to property tax liability, a tax lien in favor of each applicable taxing unit automatically attaches to all taxable property "to secure the payment of all taxes, penalties, and interest ultimately imposed for the year on the property." TEX. TAX CODE § 32.01(a); *see* § 32.07(a) ("[P]roperty taxes are the personal obligation of the person who owns or acquires the property on January 1 of the year for which the tax is imposed."). If property taxes are not paid by the owner or by another person authorized by the owner, the taxing unit may secure payment by legal action, including foreclosure on the lien, seizure and sale of personal property to satisfy the bill, or a suit to enforce personal liability for taxes. *Id.* §§ 33.21, .25, .41, .53; *see also* § 32.06 (allowing a property owner to authorize another to pay property taxes on its real property); *Cent. Appraisal Dist. of Taylor Cty. v. Dixie-Rose Jewels, Inc.*, 894 S.W.2d 841, 842 (Tex. App.—Eastland 1995, no pet.) (discussing the priority of a tax lien on personal property over other encumbrances).

Moreover, the Property Tax Code is clear that the person who owns the property on January 1 is responsible for the tax liability attached to the property. "[P]roperty taxes are the personal obligation of the person who owns or acquires the property on January 1 of the year for which the tax is imposed." TEX. TAX CODE § 32.07(a). This is true regardless of whether that person's name is listed on the appraisal roll or tax bill. *See id.* § 31.01(a), (g); *cf. Atlantic. Shippers of Tex., Inc. v. Jefferson Cty.*, 363 S.W.3d 276, 285 (Tex. App.—Beaumont 2012, no pet.) (holding that the appraisal district's failure to correct the appraisal roll under section 25.25(c) had no effect on the delinquency date of the tax). Taxing units mail the tax bill to the "person in whose name the

19

property is listed on the tax roll," but "failure to send or receive the tax bill . . . does not affect the validity of the tax, penalty, or interest, the due date, the existence of a tax lien, or any procedure instituted to collect a tax." TEX. TAX CODE § 31.01(a), (g). Similarly, failure to receive notice of appraised value as required by the Property Tax Code does not affect the property owner's obligation to pay the tax based on that appraised value. *Id.* § 25.19(d). And "[a] mistake in the name or address of an owner does not affect the validity of the appraisal records, of any appraisal or tax roll based on them, or of the tax imposed." *Id.* § 25.02(b). Taxes are due upon receipt of the tax bill, but delinquency is not dependent on such receipt. Rather, taxes "are delinquent if not paid before February 1 of the year following the year in which imposed." *Id.* § 31.02(a). Delinquent taxes incur penalties and accrue interest regardless of the reason for delinquency. *Id.* § 33.01. *But see id.* § 33.011(a)(1) (providing that a taxing unit shall waive penalties and interest if the taxing unit or appraisal district "caused or resulted in the taxpayer's failure to pay the tax before delinquency" and the tax is paid within twenty-one days of "the date the taxpayer knows or should know of the delinquency"). Thus, a property owner should make sure that the appraisal district records accurately reflect the owner's name, address, and property. In the case of tangible personal property, when a property owner files its rendition, the owner ensures that the appraisal district has its name, address, and opinion of the property's value on file. *See id.* § 22.01(a) (requiring a rendition of "all tangible personal property used for the production of income that the person owns," which must include the name and address of the property owner). When a property owner does not ensure that the appraisal district records correctly lists its name, address, and property, inaccuracies on the appraisal roll and tax roll may result. Such inaccuracies do not relieve the property owner of its tax liability; rather, under the Property Tax Code, the property owner is liable for the taxes on property it owns, even if

20

it does not receive a tax bill or if the tax bill goes to another who is incorrectly listed as the owner. In other words, ownership gives rise to tax liability, and the appraisal roll and tax roll merely reflect such ownership—they do not establish ownership or create tax liability.[8]

Turning our attention back to section 25.25 and the Property Tax Code's provisions allowing corrections of appraisal rolls to reflect ownership, of course we do not read the restrictive language in section 25.25(b) as having no meaning. *See TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016) ("[W]e consider the statute as a whole, giving effect to each provision so that none is rendered meaningless or mere surplusage."). However, we disagree with Sebastian's contention that "does not increase the amount of tax liability" means "does not increase the amount of anyone's tax bill." Under the Property Tax Code, the actual property owner bears personal responsibility for paying taxes on property it owns, and tax liability exists even if an error in the appraisal roll or tax roll results in the property owner not receiving a tax bill. Consistent with our analysis of the Property Tax Code, we read the restriction against increasing "the amount of tax liability" as referring to an increase in the appraised value of that property that would increase the corresponding tax liability attached to the property.[9]

---

[8] We note that the Legislature knows how to specify when the tax roll or related records constitute prima facie evidence—as it did for tax records in a suit to collect delinquent taxes—but nowhere has the Legislature provided that the appraisal records, appraisal roll, or tax roll constitute conclusive evidence of ownership. *See id.* § 33.47; *see also In re Bridgestone Am.'s Tire Operations, LLC*, 459 S.W.3d 565, 572 (Tex. 2015) ("We presume the Legislature enacted the statute 'with complete knowledge of the existing law and with reference to it.'") (quoting *Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990)); *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012) ("[T]his Court presumes the Legislature deliberately and purposefully selects words and phrases it enacts, as well as deliberately and purposefully omits words and phrases it does not enact.").

[9] Under the court of appeals' contrary holding—that section 25.25(b) prohibits corrections that would result in an increase in the amount of the property owner's tax bill and the corresponding assumption that tax liability is established by the name on the appraisal roll—an appraisal district would always be prohibited from correcting ownership because such a change would necessarily result in an increase in the actual owner's tax bill. *See* 492 S.W.3d at 835. Moreover, an appraisal district would be prohibited from taking action to ensure that its appraisal roll accurately lists as the owner the person with tax liability for the subject property—the person who, in most cases, should receive the tax bill going forward. This approach renders the relevant portion of section 25.25(b) meaningless.

21

A correction under section 25.25 as to the appraisal roll's reflection of property ownership will certainly affect the taxing units' expectation of who will pay the tax bill, but it does not increase, or even affect, the tax liability for that property. *See* TEX. TAX CODE §§ 25.02, 31.01, 31.02, 32.07. And, in fact, "the Taxing Authorities are not permitted under section 25.25 to *increase the value* at which property had been appraised after the appraisal roll has been certified." *MAG-T, L.P.*, 161 S.W.3d at 627. Property taxes are tied to property, and property-tax liability arises out of actual property ownership, not the appraisal roll and tax roll reflection of ownership, which may be inaccurate when a property owner has not ensured that the appraisal district records accurately list its name and address. Simply put, tax liability exists independently of the appraisal roll or tax bill.

In this case, WCAD ultimately determined that Sebastian, not DeBruce, was the owner of the personal property at issue based on the NGFA rules incorporated into the sales contracts. Both the WCARB and the district court agreed. The chief appraiser's correction under section 25.25(b) did not change the value of the grain; it merely attributed ownership of that same-valued grain back to Sebastian. That correction, of course, resulted in the taxing units' expectation that Sebastian, and not DeBruce, would pay the taxes due on the grain. And it likely meant that DeBruce was entitled to a refund of the property taxes it paid under protest, pending resolution of its challenge to the section 25.25(c) ownership change. *See* TEX. TAX CODE § 31.071 (providing for conditional payment before delinquency date for property taxes under protest or challenge, and for refund of taxes not owed at the conclusion of protest). But under the Property Tax Code, WCAD's correction had no effect on tax liability—if Sebastian was indeed the owner on January 1, Sebastian was liable for property taxes regardless of whose name appeared on the appraisal roll or the tax bill. Therefore,

22

we hold that WCAD acted within its authority to correct the ownership of grain under section 25.25(b).[10] We reverse the court of appeals' holding on this issue.

This, of course, implicates the issue of who actually owned the property on January 1, 2009 and is liable for the property taxes on the grain. Sebastian argues that DeBruce owned the grain and is therefore liable for the taxes.[11] Its primary argument on this issue is that DeBruce paid storage fees on the grain and would not have done so if it did not own the grain. DeBruce, who is not a party to this proceeding, indicated to WCAD that the NGFA rules, incorporated into the sales contracts, dictate that title did not pass until shipment, meaning that Sebastian had title on January 1, the date for determining tax liability. The district court based its factual finding that Sebastian owned the grain on those rules. Sebastian counters that title is not the same as ownership, and even if DeBruce did not hold legal title to the grain, it held equitable title. Generally, equitable title has been considered sufficient to establish ownership for property tax purposes. *See AHF–Arbors at Huntsville I, LLC v. Walker Cty. Appraisal Dist.*, 410 S.W.3d 831, 837, 839 (Tex. 2012) (defining "equitable title" as "the present right to compel legal title" and holding that it is sufficient to establish ownership for the purpose of exemptions under the Property Tax Code); *Travis Cent. Appraisal Dist. v. Signature Flight Support Corp.*, 140 S.W.3d 883, 840 (Tex. App.—Austin 2004, no pet.) (listing Texas appellate court cases that suggest that a person holding equitable title to property may be the owner for taxation purposes). The court of appeals did not reach the issue of ownership, which

---

[10] Because we assume for purposes of this discussion that the restrictive clause applies to each listed correction in section 25.25(b), and because we hold that WCAD's ownership correction did not increase the amount of tax liability for the subject grain, we need not decide whether it might be possible for an ownership correction to be outside the chief appraiser's authority in another case.

[11] The sufficiency of the evidence supporting the district court's determination of ownership has not been raised before this Court or before the court of appeals, though Sebastian has challenged the sufficiency of the evidence as to the fraud claim, which involves Sebastian's representations as to ownership. We express no opinion on whether the issue of ownership has been adequately preserved for appeal.

raises both factual and legal questions,[12] because its holding on the construction of section 25.25(b)

was dispositive.  Therefore, we remand the case to that court for further consideration of this issue.

## B.  Section 1.111 Agreement

The parties also ask us to consider whether an agreement under section 1.111(e) of the

Property Tax Code may be voided if it was induced by fraud.  *See* TEX. TAX CODE § 1.111(e).

Section 1.111 provides, in relevant part:

> (e) An agreement between a property owner or the owner's agent and the chief
> appraiser is final if the agreement relates to a matter:
>
>> (1) which may be protested to the appraisal review board or on which a
>> protest has been filed but not determined by the board; or
>>
>> (2) which may be corrected under Section 25.25 or on which a motion for
>> correction under that section has been filed but not determined by the board.

*Id.*  "The board may not review or reject an agreement between a property owner or the owner's

agent and the chief appraiser under Section 1.111(e)."  *Id.* § 41.01(b).

Courts have held that the finality of section 1.111(e) agreements precludes judicial review

of those agreements.  *See Sondock*, 231 S.W.3d at 69–71; *Bastrop Cent. Appraisal Dist. v. Acme

Brick Co.*, 428 S.W.3d 911, 917 (Tex. App.—Austin 2014, no pet.).  Section 1.111(e) agreements

become final without approval or adoption by the ARB.  *Acme Brick Co.*, 428 S.W.3d at 917; *MHCB

(USA) Leasing & Fin. Corp. v. Galveston Cent. Appraisal Dist.*, 249 S.W.3d 68, 83 (Tex.

App.—Houston [1st Dist.] 2007, pet. denied).  In fact, the Property Tax Code precludes an ARB

---

[12] Under Texas common law, a determination of ownership is both factual and legal in nature.  *See Hudson Buick, Pontiac, GMC Truck Co., v. Gooch*, 7 S.W.3d 191, 195–96 (Tex. App.—Tyler 1999, pet. denied) (noting that a "determination of ownership . . . is a conclusion of law based upon established facts); *see also Smith v. Allstate Ins. Co.*, 467 F.2d 104, 106 (5th Cir. 1972).  "[W]here facts surrounding the transaction are uncontested, ownership issue is a legal question."  *Hudson Buick*, 7 S.W.3d at 195–96; *see also In re Terrabon, Inc.*, No. 12-36805, 2013 WL 6157980, at *3–4 (Bankr. S.D. Tex. Nov. 22, 2013) (holding that where the facts and circumstances are conclusively established, ownership becomes a question of law).

from even reviewing such agreements. *MHCB (USA) Leasing & Fin. Corp.*, 249 S.W.3d at 83 (quoting *Sondock*, 231 S.W.3d at 69–70) ("In 1993, the Legislature amended section 1.111(e) by deleting the previous requirement that the Board must approve of the agreement before it became final."). The parties concede that an agreement resolved Sebastian's section 25.25(c) motion to correct the appraisal roll. However, before a court finds that a section 1.111(e) agreement is "final" and therefore cannot be reviewed, it must confirm whether (1) the agreement actually constitutes a section 1.111(e) agreement, and (2) what the terms of the agreement actually cover.

As an initial matter, nothing in section 1.111(e)'s text requires that such an agreement be in writing. Courts analyzing the issue have reached the conclusion that an oral communication may constitute a section 1.111(e) agreement, and nobody argues otherwise in this case. *E.g.*, *Sondock*, 231 S.W.3d at 69 (considering an agreement as to the value of property). In *Sondock*, the owner's agent stated at the protest hearing a property value of $880,500, and the appraisal district's representative said, "The District concurs." *Id.* at 68. The court of appeals in that case held that the verbal exchange as to value was sufficient to establish an agreement under section 1.111(e), because there was "harmony of opinion" between the property owner and the appraisal district. *Id.* (quoting *Agreement*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2006)). *Sondock* and its progeny rely on the ordinary meaning of "agreement," because the Property Tax Code does not define the term. *Id.*; *see also Bullseye PS III LP v. Harris Cty. Appraisal Dist.*, 365 S.W.3d 427, 432 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

We note that in other contexts, the Property Tax Code requires agreements to be in writing and signed. *See, e.g.*, TEX. TAX CODE §§ 1.085(a), (b) (permitting the chief appraiser and the property owner to agree to communicate by email, and detailing the requirements of such an

agreement), 31.01(k) (permitting the assessor for a taxing unit and the individual or entity to receive a tax bill to communicate by email and detailing the requirements of such an agreement); *cf. id.* § 1.111(f) (requiring a property owner's designation of an agent to be in writing). For example, when a property owner consents to receive its notice of appraised value electronically, that agreement must be in writing, signed by both the property owner and the chief appraiser, and it must contain specified content. *See id.* § 1.085(b). We cannot explain why the Legislature would require such formalities in that context but not in the context of an agreement that finally resolves an appraisal-roll dispute and precludes any sort of review. But we see no analogous requirements with respect to section 1.111(e) agreements. Therefore, although we find it curious that the Legislature would afford oral, unverifiable agreements such finality, we are inclined to agree with the courts of appeals that have held that these agreements need not be in writing. Here, Sebastian alleges—and WCAD does not dispute—that a section 1.111(e) agreement arose out of the phone conversation between Jurica and the chief appraiser. Jurica testified in his affidavit, "At that point, it was clear we had reached an agreement on the Section 25.25 Motion to Correct Ownership that I had filed." Accordingly, the oral agreement between the parties in this case may be sufficient to establish a section 1.111(e) agreement, assuming the agreement was made by a proper party.

With that said, the plain language of section 1.111(e) requires that agreements afforded finality under the statute must be between a property owner and the chief appraiser. We note that if the Legislature had intended to accord such finality to agreements between the chief appraiser and the person or entity listed as the owner on the appraisal roll, or some other person, it could have so provided, but the Legislature chose instead to limit such agreements to the "property owner." *Cf.* TEX. TAX CODE §§ 26.1125(b) (referring to "the person in whose name the property is listed on the

26

tax roll"), 33.04(a) (referring to "each person whose name appears on the current delinquent tax roll"), 41.44(d) (identifying "a person claiming an ownership interest in the property even if that person is not listed on the appraisal records as an owner of the property"). It should go without saying that if Sebastian was not the property owner, then it, by definition, lacked the authority to make an agreement under section 1.111(e). To be clear, nothing in the statute or our public policy prevents a non-owner of property from agreeing with the chief appraiser to change the appraisal rolls to reflect that the non-owner in fact does not own the property. However, such an agreement would not arise under section 1.111(e), and therefore would be subject to review by the ARB or a judicial body.

Even if Sebastian were the owner of the grain at issue, a question the court of appeals must consider on remand, the situation is nuanced under these facts—the very nature of the agreement was to establish that Sebastian was *not* the owner of the grain. In other words, Sebastian purports to be the property owner for purposes of authority to enter into a section 1.111(e) agreement, while at the same time claiming it does not own the property for purposes of the substance of that agreement and for purposes of tax liability. This raises the question of whether estoppel or quasi-estoppel may preclude Sebastian from entering into an agreement under section 1.111(e) based on its representations that it was not the property owner.[13] "Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. The

___

[13] Although WCAD did not formally plead quasi-estoppel as an affirmative defense, it did allege facts that support it. *See Colbert v. Dallas Joint Stock Land Bank of Dall.*, 102 S.W.2d 1031, 1033 (Tex. 1937) (holding that where a petition alleges sufficient facts to constitute a cause of action, the failure of the pleader to properly articulate those causes of action is not fatal, nor does it preclude this Court from addressing them); *cf. Heard v. State*, 149 S.W.2d 237, 238 (Tex. Civ. App.—Beaumont 1941, no writ) (analyzing the issue of "public lands," even though those words did not appear in the petition, because the petition "on its face did allege facts which were sufficient, when given their legal effect, to show that the nature of the suit was one for the recovery of public lands and damages thereto").

27

doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 778 (Tex. 2017) (internal quotations omitted). In determining whether the agreement in this case constitutes an agreement under section 1.111(e), the court of appeals on remand should consider whether Sebastian—if it in fact owned the grain at issue and therefore was a proper party to enter a section 1.111(e) agreement—is estopped from entering into a section 1.111(e) agreement based on its assertion that it was not the owner.

To the extent that there was an otherwise valid agreement under section 1.111(e), we look then to the substance of the agreement. Section 1.111(e) agreements are limited in scope to those relating to matters:

> (1) which may be protested to the appraisal review board or on which a protest has been filed but not determined by the board; or
>
> (2) which may be corrected under Section 25.25 or on which a motion for correction under that section has been filed but not determined by the board.

TEX. TAX CODE § 1.111(e). Only the second provision is at issue here. If there was an agreement under section 1.111(e), it was to resolve Sebastian's motion to correct ownership brought under section 25.25(c), which asserted, "The purchase contract confirmations clearly establish that on January 1, 2009, 86% or the grain inventory was owned by De[B]ruce and 14% of the inventory was owned by Sebastian Cotton and Grain."

We have already determined that a property owner's tax liability exists independently of the appraisal roll or tax bill and arises out of actual ownership. As an appointed administrator, the chief appraiser lacks authority to establish ownership as a legal matter. *See generally id.* § 6.05(c) ("The chief appraiser is the chief administrator of the appraisal office. Except as provided by Section

28

6.0501, the chief appraiser is appointed by and serves at the pleasure of the appraisal district board of directors."). *But see id.* § 23.011 (outlining the chief appraiser's authority to determine market value); *Harris Cty. Appraisal Dist. v. Tex. Workforce Comm'n*, 519 S.W.3d 113, 119 (Tex. 2017) (recognizing that ARBs perform quasi-judicial functions). Instead, the chief appraiser has authority only to change the appraisal roll's reflection of ownership based on credible information and his understanding of who owns the property.[14] Therefore, we hold that the terms of a section 1.111(e) agreement do not and cannot determine actual ownership as a legal matter, as ownership cannot be finally and permanently locked in place by a chief appraiser's agreement. To the extent that the parties argue otherwise in this case, we hold that the agreement at issue did not resolve whether Sebastian or DeBruce actually owned the grain. Rather, the substance of the agreement was that Sebastian's section 25.25(c) motion would be resolved by the chief appraiser's correction of the appraisal roll to reflect DeBruce as the owner based on Sebastian's representation, thus avoiding an evidentiary hearing before the WCARB. While this correction did not determine actual ownership as a legal matter, it did alter the taxing unit's expectation of who was liable for payment, resulting in Sebastian receiving a refund for taxes paid under protest.

Supposing there was a valid agreement under section 1.111(e) by which Sebastian and the chief appraiser agreed to an appraisal-roll correction reflecting that Sebastian was not the owner of the grain on January 1, 2009, we also consider whether such an agreement may be overcome by fraud. As a preliminary matter, Sebastian contests whether the issue of fraud was properly before the district court. Specifically, Sebastian argues that WCAD's allegation of fraud was waived

---

[14] If the chief appraiser is uncertain, based on representations and information provided, who owns the property, he may file a motion to have the ARB direct changes following an evidentiary hearing, provided that the change applies to the appraisal roll for any of the five preceding years. *See* TEX. TAX CODE § 25.25(c).

because it did not raise it before the WCARB and because it did not avail itself of the Property Tax Code's procedures for pursuing a fraud claim. *See* TEX. TAX CODE §§ 22.29, 25.21. The court of appeals' analysis on this issue is correct:

> Sebastian is hybridizing the problems of issue preservation (i.e., that an appealing party must bring an argument to the attention of the trial court in order for an appellate court to later consider it) and exhaustion of administrative remedies (i.e., a party must file and go through an administrative determination on their claim before filing suit in district court).

492 S.W.3d at 828. With respect to preservation, WCAD's allegation of fraud is not waived by its failure to raise it before the WCARB. An appeal of an ARB determination to the district court is a trial de novo, and the district court "shall try all issues of fact and law raised by the pleadings in the manner applicable to civil suits generally." TEX. TAX CODE § 42.23(a). A trial de novo is "[a] new trial on the entire case—that is, on both questions of fact and issues of law—conducted as if there had been no trial in the first instance." *Trial de novo*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also PR Invs. & Specialty Retailers, Inc. v. State*, 251 S.W.3d 472, 476 (Tex. 2008). Such a trial is "appellate" only as distinguished from "original" or "concurrent," but not in the sense that the evidence is fixed or that court is confined to that paper record. *Id.* A trial de novo is not confined to the same evidence that was presented during the administrative phase, and "the reviewing court shall try each issue of fact and law in the manner that applies to other civil suits in this state as though there had not been an intervening agency action or decision." *Id.* Thus, in a trial de novo, a court may consider arguments and evidence that are introduced afresh.

Moreover, in this case, the issue of fraud was raised only as an affirmative defense to the section 1.111(e) agreement, which was not raised until the trial de novo. Generally, an affirmative defense is waived if not raised in a defendant's responsive pleading. *Shoemake v. Fogel, Ltd.*, 826

30

S.W.2d 933, 937 (Tex. 1992) (citing TEX. R. CIV. P. 94). WCAD raised the affirmative defense, however, by pleading fraud in its answer to Sebastian's petition for review before the district court. As an affirmative defense to the section 1.111(e) agreement, WCAD had no obligation to raise fraud prior to Sebastian raising the finality of the section 1.111(e) agreement; therefore, it did not waive the issue of fraud by failing to raise it sooner.

Sebastian argues that WCAD failed to exhaust its administrative remedies by not pursuing a fraud claim under section 25.21 or section 22.29 of the Property Tax Code. We disagree. Section 25.21 allows the chief appraiser to appraise and levy taxes on property that was omitted from an appraisal roll. TEX. TAX CODE § 25.21. This section "provides a remedy for an erroneous appraisal based on property that escaped taxation because of a void assessment arising from taxpayer fraud." *Beck & Masten Pontiac-GMC, Inc. v. Harris Cty. Appraisal Dist.*, 830 S.W.2d 291, 295 n.3 (Tex. App.—Houston [14th Dist.] 1992, writ denied). However, here the property was not omitted from the tax rolls; it was simply listed with a potentially wrong owner. This provision is thus inapplicable where the error can be corrected under section 25.25(b). Section 22.29 is similarly inapplicable. This section provides a remedy for taxpayer fraud under which a chief appraiser may impose a penalty if it is determined by a court that "the person filed a false statement or report with the intent to commit fraud or to evade the tax." TEX. TAX CODE § 22.29(a)(1). However, it does not provide a mechanism for correcting the inaccuracies that result from the fraud. Here, WCAD has not sought to pursue a penalty under section 22.29.[15] And given that fraud was raised only as an affirmative defense and not as a cause of action, there was no need for WCAD to pursue a remedy under section

_____

[15] We do not decide whether Sebastian might be subject to a penalty for fraud under section 22.29 if a court finally determines that there was fraudulent conduct with the intent to evade the tax.

31

22.29 when it could simply correct the appraisal roll under section 25.25(b). Therefore, WCAD did not fail to exhaust its administrative remedies with regards to fraud.

Having determined that fraud was properly before the district court, we turn to the implications of that court's factual findings of fraud. We acknowledge that the legislative intent behind section 1.111 was "to make it easier for parties to reach agreements in the event of a dispute involving taxable property." *Sondock*, 231 S.W.3d at 69. We also acknowledge the Legislature's effort to streamline the dispute-resolution process by making agreements under this section final and non-reviewable. *See* TEX. TAX CODE §§ 1.111(e), 41.01. And we have recognized the Legislature's authority to limit judicial review of executive actions. *See Morath v. Sterling City Indep. Sch. Dist.*, 499 S.W.3d 407, 412 (Tex. 2016) (holding that a statute making the Commissioner of Education's decisions final rendered those decisions beyond judicial review). Regardless, we find no basis in section 1.111(e)'s text or in our jurisprudence discussing the "finality" of legislatively authorized actions for holding that a fraudulently procured agreement binds an appraisal district.

Generally, the effect of a statute making an executive determination final is to broaden the executive's discretion by disallowing challenges to executive decisions, *Morath*, 499 S.W.3d at 413, not to prevent an executive from revisiting his own determination when it was incorrectly made. We note that cases in which we have held that such statutes render challenges nonjusticiable have involved executives acting of their own volition in making determinations. *E.g.*, *id.* at 410 (dealing with a "determination by the commissioner"); *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 5 (Tex. 2014) (dealing with the "determination of any fact by the pension board"); *Houston Mun. Emps. Pension Sys. v. Ferrell*, 248 S.W.3d 151, 158 (Tex. 2007) (same). Section 1.111(e) is distinguished from the statutes at issue in those cases because it does not deal with the

32

chief appraiser's independent determination, but rather with an agreement between the property owner and the chief appraiser to resolve a pending dispute and avoid an evidentiary hearing and ARB decision that would be subject to judicial review. *See* TEX. TAX CODE §§ 1.111(e). As such agreements may be, and often are, entered into at the bequest of the taxpayer, they are naturally subject to the possibility of being fraudulently induced by a taxpayer seeking to avoid paying property taxes. A statute that rewards fraud with finality and non-reviewability violates both the Legislature's intent in streamlining the dispute-resolution process and any notion of sound public policy. *Cf. Anderton*, 26 S.W.3d at 542 (noting the Legislature's intent to permit the correction of errors only where such errors would cause the payment of taxes to be "fundamentally unfair"). Accordingly, we hold that when, as here, the Legislature has made an agreement between a taxpayer and an appraisal district's administrative official final, the validity of such an agreement may be subject to attack on the basis of fraud, even if the agreement is not otherwise subject to review or rejection. *See Bastrop Cent. Appraisal Dist.*, 428 S.W.3d at 918 n.6; *In re Willacy Cty. Appraisal Dist.*, 2013 WL 5942707, at *4.

Thus, although a section 1.111(e) agreement is not the same as a contract, *see MHCB (USA) Leasing & Fin. Corp.*, 249 S.W.3d at 85 (distinguishing between a contract and an agreement under section 1.111(e), properly characterized as a "statutory agreement"), some basic contract principles apply. "A contract is subject to avoidance on the ground of fraudulent inducement." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331 (Tex. 2011); *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. c (1981) ("What appears to be a complete and binding integrated agreement . . . may be voidable for fraud . . . ."). Generally, a contract may be either void and a nullity from its inception, or voidable.

33

*Harris v. Archer*, 134 S.W.3d 411, 427 (Tex. App.—Amarillo 2004, pet. denied); *see also*

RESTATEMENT (SECOND) OF CONTRACTS § 7 (1981) ("A voidable contract is one where one or more

parties have the power, by a manifestation of election to do so, to avoid the legal relations created

by the contract."). A contract that is the product of fraudulent misrepresentations is merely voidable,

not void from its inception. *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427 (1998); *Harris*,

134 S.W.3d at 427. The court of appeals did not reach the issue of the sufficiency of the evidence

with respect to fraud, an issue which seems to require a determination of ownership. However, if

the district court's findings as to fraud are supported by factually and legally sufficient evidence, then

the section 1.111(e) agreement, to the extent that there was one, will be rendered voidable.

### C. Attorney's Fees

Sebastian contends that if it prevails in this Court, it is entitled to attorney's fees under

Property Tax Code section 42.29. *See* TEX. TAX CODE § 42.29 (providing for a property owner

prevailing in certain appeals to recover reasonable attorney's fees). We disagree. Attorney's fees

may not be recovered unless provided for by statute or by contract between the parties. *Dall. Cent.*

*Appraisal Dist. v. Seven Inv. Co.*, 835 S.W.2d 75, 77 (Tex. 1992) (citing *New Amsterdam Cas. Co.*

*v. Tex. Indus., Inc.*, 414 S.W.2d 914, 915 (Tex. 1967)). The only provision in the Property Tax Code

authorizing the recovery of attorney's fees is section 42.29, which provides in relevant part: "A

property owner who prevails . . . in an appeal to the court of a determination of an appraisal review

board on a motion filed under Section 25.25 . . . may be awarded reasonable attorney's fees." TEX.

TAX CODE § 42.29(a). Therefore, we analyze whether this section applies to this case.

We note at the outset that this issue presents the same problem as the issue of the section

1.111(e) agreement—Sebastian purports to be the property owner for purposes of an attorney's fee

award under section 42.29, but argues that it is not the property owner for purposes of tax liability. In other words, Sebastian argues that if it is successful in arguing to this Court that it is not the property owner, then it is entitled to attorney's fees as the "property owner who prevails" on its section 25.25(c) motion asserting that it is not the property owner.

We interpret the requirements of section 42.29 narrowly. *See Seven Inv. Co.*, 835 S.W.2d at 77–79. In *Seven Investment Co.*, we analyzed whether the taxpayers' appeal of the denial of an open-space land designation entitled them to attorney's fees under section 42.29 and held that it did not. *Id.* The taxpayers pointed to section 42.29's award of attorney's fees to a property owner who "prevail[ed] in an appeal to the court under Section 42.25 or Section 42.26 of [the Property Tax Code]." *Id.* (citing Act of May 30, 1983, 68th Leg., R.S., ch. 905, § 1, 1983 Tex. Gen. Laws 5033 (amended 2013) (current version at TEX. TAX CODE § 42.29)). Section 42.25 provides, as it did at the time of *Seven Investment Co.*, that a taxpayer is entitled to a reduction of the appraised value on the appraisal roll if "the court determine[s] that the appraised value of the property according to the appraisal roll *exceed[s] the appraised value* required by law." TEX. TAX CODE § 42.25 (emphasis added). The court of appeals in *Seven Investment Co.* reasoned that by protesting the denial of the open-space land designation, the taxpayers also simultaneously protested the excessive appraised value of their property. *Dall. Cent. Appraisal Dist. v. Seven Inv. Co.*, 813 S.W.2d 197, 205 (Tex. App.—Dallas 1991, pet. granted), rev'd, 835 S.W.2d 75 (Tex. 1992). We reversed, holding that the statutory provisions allowing for a protest of an excessive appraisal (section 41.41(a)(1)) or for a protest of an unequal appraisal (section 41.41(a)(2)) were "separate and distinct" from the provision allowing for a protest of a determination that property does not qualify for an appraisal (section 41.41(a)(5)). *Seven Inv. Co.*, 835 S.W.2d at 78–80. In other words, section 42.29 limited the

35

recovery of attorney's fees for the appeal of a protest under section 41.41(1) or (2); however, the taxpayers had protested under section 41.41(5). *See id.* The fact that the Legislature had identified the two protests separately was a clear indication that the two were not synonymous. *Id.* at 78. "Such a broad interpretation of section 42.29 is contrary to the [L]egislature's attempt to limit the award of attorney's fees to excessive appraisals and unequal appraisals under section[] 42.25." *Id.* at 79.

Similarly, Sebastian requests attorney's fees as the prevailing party "in an appeal to the court of a determination of an appraisal review board on a motion filed under Section 25.25." TEX. TAX CODE § 42.29(a). This language necessarily limits attorney's fees to an appeal arising under section 42.01(a)(1)(B): "A property owner is entitled to appeal . . . a determination of an appraisal review board on a motion filed under Section 25.25." *Id.* § 42.01(a)(1)(B). Under section 25.25, only subsections (c) and (d) involve a motion. *Id.* § 25.25(c), (d). Moreover, only those two subsections provide for a hearing and a determination by the ARB. *Id.* Section 25.25(b), on the other hand, "does not (1) contemplate the filing or presentation of any motion or protest, or (2) authorize the appraisal review board to change the appraisal roll." *W. Athletic Clubs, Inc. v. Harris Cty. Appraisal Dist.*, 56 S.W.3d 269, 273–74 (Tex. App.—Amarillo 2001, no pet.). Therefore, only determinations under section 25.25(c) and (d) are appealable through section 42.01(a)(1)(B); consequently, only actions originating under those two subsections entitle a prevailing taxpayer to collect attorney's fees.

This case, however, did not originate with a motion under section 25.25(c) or (d) and is therefore not before us on an appeal under section 42.01(a)(1)(B). Instead, this case began

procedurally with WCAD's ownership correction under section 25.25(b).[16] Subsection (b) involves neither a motion nor a determination by the ARB.[17] TEX. TAX CODE § 25.25(b); *W. Athletic Clubs, Inc.*, 56 S.W.3d at 273–74. Although a section 25.25(b) correction may be subject to protest under 41.41(a) when it "applies to and adversely affects the property owner," an appeal in such a case would arise under section 42.01(a)(1)(A): "A property owner is entitled to appeal [] an order of the appraisal review board determining [] a protest by the property owner as provided by Subchapter C of Chapter 41." *Id.* §§ 41.41(a), 42.01(a)(1)(A).

The fact that the Legislature has distinguished between corrections based on motions filed under section 25.25(c) and (d) and corrections made by the chief appraiser under section 25.25(b) is a "clear indication" that the two are not synonymous. *See Seven Inv. Co.*, 835 S.W.2d at 78. Indeed, they are protested and appealed under different statutes. Because attorney's fees under the relevant portion of section 42.29 may be recovered only by a property owner who prevails in an appeal of an action originating with a motion under section 25.25(c) or (d), we hold that Sebastian is not entitled to attorney's fees in its appeal of WCAD's section 25.25(b) correction as to ownership of the grain.

### III. Conclusion

We hold that WCAD acted within its authority to correct an appraisal roll under section 25.25(b) to reflect ownership of taxable property. This change did not increase the "amount of tax

---

[16] Sebastian did initially file a motion under section 25.25(c); however, that motion was never determined by the WCARB and therefore it did not result in an appealable order.

[17] Although the Property Tax Code does not specifically address review of corrections made under section 25.25(b), the Code does provide that the chief appraiser's failure or refusal to change an appraisal roll under section 25.25(b) cannot be reviewed by the ARB, is not entitled to protest under section 41.41, and cannot be appealed. TEX. TAX CODE § 25.25(o).

liability" attached to the property; the owner of the property on January 1, 2009 is liable for the taxes assessed on the property irrespective of who is listed on the appraisal roll or receives the tax bill. *See* TEX. TAX CODE §§ 25.25(b), 32.07. With respect to agreements as to section 25.25 corrections, we hold that before a court recognizes an agreement as final and unreviewable, the court must confirm that the agreement constitutes a section 1.111(e) agreement between a property owner and the chief appraiser. *See id.* § 1.111(e). We further hold that an otherwise valid agreement under section 1.111(e) of the Property Tax Code may be voidable if there is factually and legally sufficient evidence to support a finding of fraud. Finally, we hold that Sebastian is not entitled to attorney's fees under section 42.29. *See id.* § 42.29. Accordingly, we reverse the judgment of the court of appeals and remand this case to that court for further consideration consistent with this opinion.

_____
Paul W. Green
Justice

OPINION DELIVERED: April 27, 2018

38